IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | CASE NO. BK05-80059 |
| ) | A06-8015 |
| ACCEPTANCE INSURANCE ) | A06-8115 |
| COMPANIES, INC., ) | (consolidated for trial) |
| ) | |
| Debtor(s). ) | CH. 11 |
| GRANITE REINSURANCE COMPANY, LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| ACCEPTANCE INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ACCEPTANCE REINSURANCE ) | |
| COMPANIES, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| GRANITE REINSURANCE COMPANY, LTD., ) | |
| ) | |
| Defendant. ) | |

<u>MEMORANDUM</u>

Trial was held in Omaha, Nebraska, on February 27 and 28, 2007, on the complaint filed by Granite Reinsurance Company, Ltd.; the complaint filed by the debtor; and on the claim filed by Granite Reinsurance Company, Ltd., in the bankruptcy case. Robert F. Craig and Jenna B. Taub appeared for Granite Reinsurance Company, Ltd., and Patrick Griffin and John J. Jolley, Jr., appeared for Acceptance Insurance Companies, Inc., and Acceptance Insurance Company. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. The claim litigation and the issues raised in the adversary proceeding filed by the debtor are core proceedings as defined by 28 U.S.C. § 157(b)(2)(B) and(O). The adversary proceeding filed by Granite Reinsurance Company, Ltd., against Acceptance Insurance Company is related to the bankruptcy case, was referred to the bankruptcy court by the district court, and the parties have consented to trial before the bankruptcy court and to the bankruptcy court completely adjudicating the matter.

<u>Introduction and Decision</u>

Granite Reinsurance Company, Ltd. ("Granite Re"), a Barbados reinsurer, filed a proof of claim against Acceptance Insurance Companies, Inc. ("AICI"), in its Chapter 11 proceeding claiming AICI owes it $9,000,000 of premium, plus interest, pursuant to an MPCI Stop Loss Reinsurance Contract ("Contract") issued by Granite Re. Subsequently, Granite Re filed a complaint in the United States District Court for the District of Nebraska against AICI's wholly owned subsidiary, Acceptance Insurance Company ("AIC"), alleging AIC also is liable to Granite Re on the same

Contract. By consent, the district court transferred Granite Re's proceeding against AIC to this court, which consolidated the proceeding with proceedings in AICI's Chapter 11 proceeding as Adversary Proceeding No. A06-8015.

AICI thereafter initiated a separate adversary proceeding against Granite Re asserting a claim for unjust enrichment. (Adv. Pro. No. A06-8115). AICI asserts the Contract lacked consideration, and that Granite Re has been unjustly enriched by the $6,000,000 AICI paid to Granite Re for reinsurance Granite Re did not in fact provide. All issues associated with Granite Re's proof of claim asserted against AICI, Granite Re's adversary complaint against AIC, and AICI's adversary complaint against Granite Re have been consolidated for discovery and trial.

After considering the evidence concerning the intent of the parties at the time of the execution of the contract, the written terms of the contract, and the post-trial briefs submitted by the parties, I find:

1. The parties to the Contract include AICI, AIC, American Growers Insurance Company ("AGIC"), and Granite Re.

2. The Contract did actually provide reinsurance coverage as intended.

3. The Contract provides coverage, if needed, for a maximum of five years and a maximum total dollar risk, though premiums were due annually for any crop insurance coverage needed. No coverage was needed after 2002, and Granite Re provided indemnity protection, as required by a separate Asset Purchase Agreement, for no premium in addition to that charged for reinsuring the initial crop insurance policies.

4. Granite Re has no right to premiums for 2003, 2004, and 2005, and the debtor and its subsidiaries have no right to a refund of premiums paid.

5. Both adversary proceedings will be dismissed by separate order and the Granite Re claim filed in the bankruptcy case will be denied.

Law

The parties agree that Article 17 of the Contract provides that Iowa law applies to interpretation of the Contract.

Contracts are interpreted as they are written, unless the language is ambiguous.

> Generally, contracts are interpreted based on the language within the four corners of the document. See Smidt v. Porter, 695 N.W.2d 9, 21 (Iowa 2005) ("It is a fundamental and well-settled rule that when a contract is not ambiguous, we must simply interpret it as written." (citing State Pub. Defender v. Iowa Dist. Ct., 594 N.W.2d 34, 37 (Iowa 1999); Rogers v. Md. Cas. Co., 252 Iowa 1096, 1098-99, 109 N.W.2d 435, 437 (1961))). However, when the language is ambiguous, we must engage in a process of interpretation to search for "the meanings attached by each party at the time the contract was made." E. Allan Farnsworth, Contracts § 7.9, at 458 (3d ed. 1999). To reveal this intent, extrinsic evidence is admissible "'when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain.'" Dickson v. Hubbell

>  Realty Co., 567 N.W.2d 427, 430 (Iowa 1997) (quoting Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984)).

Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc., 714 N.W.2d 603, 615 (Iowa 2006). See also Am. Family Mut. Ins. Co. v. Petersen, 679 N.W.2d 571, 579 (Iowa 2004) ("The intention of the parties to a contract must be derived from the language of the entire contract.") and Koenigs v. Mitchell County Bd. of Supervisors, 659 N.W.2d 589, 594 (Iowa 2003) ("The parties' intent as evidenced by all of the terms of the contract controls our conclusion." (citing Grinnell Mut. Reins. Co. v. Jungling, 654 N.W.2d 530, 536 (Iowa 2002) and A.Y. McDonald Indus. v. Ins. Co. of N. Am., 475 N.W.2d 607, 618 (Iowa 1991))).

The words of the contract are the evidence of the parties' intention.

>  Contract interpretation determines the meaning of contract words. Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999). . . .
>> Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper."
>> Walsh v. Nelson, 622 N.W.2d 499, 503 (Iowa 2001) (citations omitted).
>  Once the court identifies an ambiguity, it then must "'choos[e] among possible meanings.'" Id. (alteration in original) (citation omitted). If extrinsic evidence is necessary to resolve the meaning of ambiguous language, "a question of interpretation arises which is reserved for the trier of fact." Id. However,
>> [a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. But after the transaction has been shown in all its length and breadth, *the words of an integrated agreement remain the most important evidence of intention.*
>> In short, although other evidence may aid the process of interpretation, the words of the contract remain the key to determining whether the . . . terms [of the offer to confess judgment] are ambiguous.
>  Id. (citation omitted).

Rick v. Sprague, 706 N.W.2d 717, 723 (Iowa 2005). See also Estate of Pearson ex rel. Latta v. Interstate Power & Light Co., 700 N.W.2d 333, 343 (Iowa 2005) ("We construe a contract in its entirety by considering all of its pertinent provisions. We assume no part of the contract is superfluous or of no effect and a construction giving meaning to all its clauses is preferred." (citations omitted)).

The same rules of construction and interpretation apply to insurance policies, although ambiguities are generally resolved in favor of the insured.

> Well-established principles govern our interpretation of this insurance policy, a form of written contract. Iowa Rule of Appellate Procedure 14(f)(14) provides:
>> In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says.
>
> The object of contract interpretation is to ascertain from the language "the intent of the contracting parties at the time the contract was made." Home Federal Savings and Loan Association v. Campney, 357 N.W.2d 613, 617 (Iowa 1984). . . .
>
> Ambiguity exists if, "after the application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one." Fraternal Order of Eagles v. Illinois Casualty Co., 364 N.W.2d 218, 221 (Iowa 1985) (quoting Gendler Stone Products Co. v. Laub, 179 N.W.2d 628, 631 (Iowa 1970)). We construe ambiguous insurance policy provisions in a light favorable to the insured because insurance policies constitute adhesion contracts. Gateway State Bank v. North River Insurance Co., 387 N.W.2d 344, 346 (Iowa 1986). It is therefore incumbent upon an insurer to define clearly and explicitly any limitations or exclusions to coverage expressed by broad promises. Id. at 346; Bankers Life Co. v. Aetna Casualty & Surety Co., 366 N.W.2d 166, 169 (Iowa 1985). In examining an insurance policy, however, we will not "write a new contract of insurance between the parties" where there is no ambiguity. Stover v. State Farm Mutual Insurance Co., 189 N.W.2d 588, 591 (Iowa 1971). We avoid straining the words and phrases of the policy "to impose liability that was not intended and was not purchased." Gateway, 387 N.W.2d at 346; State Farm Auto Insurance Co. v. Malcolm, 259 N.W.2d 833, 835 (Iowa 1977).

Cairns v. Grinnell Mut. Reinsurance Co., 398 N.W.2d 821, 823-24 (Iowa 1987).

Likewise,

> The insurance policy must be construed as a whole; the words used must be given their ordinary, not technical, meaning to achieve a practical and fair interpretation. Holty, 402 N.W.2d at 454 (quoting Aetna Cas. & Sur. Co. v. Jewett Lumber Co., 209 N.W.2d 48, 49 (Iowa 1973)). Where the meaning of the terms in an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted. Id.

West Bend Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 624 N.W.2d 422, 424 (Iowa 2001).

<u>Background and Findings of Fact</u>

AICI, the debtor, is a corporation which is a holding company with a number of insurance company subsidiaries. Those included AIC, AGIC, and American Agrisurance, Inc. ("AMAG"). When referring to more than one of the companies, the term "Acceptance Companies" will be used.

In May of 2001, the Acceptance Companies identified above entered into an Asset Purchase Agreement with Goran Capital, Inc. ("Goran"), Symons International Group, Inc. ("SIG"), IGF Holdings, Inc. ("IGFH"), and IGF Insurance Company ("IGF"). (Filing No. 95).

By such Asset Purchase Agreement, the Acceptance Companies purchased hard assets, including computers, desks, chairs, files, etc., and a book of business, including but not limited to

multi-peril crop insurance ("MPCI") policies which had been issued by IGF to farmers throughout the nation. Multi-peril crop insurance policies are issued by various insurance companies which participate in a federal program that provides to the insurance carrier certain guarantees to reduce the ultimate risk to the insurance company. However, the federal program requires insurance companies issuing such policies to "reinsure" a portion of the risk represented by the policies which are sold. Granite Re was in the business of providing such reinsurance to sellers of multi-peril crop insurance, as well as providing reinsurance to sellers of other types of insurance policies.

In order to complete the Asset Purchase Agreement, the Acceptance Companies needed to show the federal crop insurance authority that the policies being purchased from IGF were reinsured at a particular level of possible loss. Granite Re agreed to provide the required reinsurance at the loss level specified by the Federal Crop Insurance Program, the federal program administered by the Federal Crop Insurance Corporation ("FCIC") and its agents. In addition, in order to complete the Asset Purchase Agreement, the purchasing entities required some protection from the possibility that some of the policies which were being purchased had not been issued in conformance with the federal crop insurance guidelines, which could result in the Federal Crop Insurance Program refusing to pay when the Acceptance Companies made claims against the Federal Crop Insurance Program. The purchasers also desired to be protected from any claims brought by third parties concerning any of the assets transferred. Therefore, as part of the reinsurance agreement, Granite Re agreed to indemnify the Acceptance Companies up to $9,000,000 concerning the possible losses described above.

The Asset Purchase Agreement, Filing No. 95, identifies Goran and SIG as "shareholders" and IGFH and IGF are referred collectively as "sellers." Mr. Symons was an officer of SIG and negotiated the Asset Purchase Agreement on behalf of the shareholders and sellers. In addition, Mr. Symons was involved in some capacity with Granite Re and negotiated the MPCI Stop Loss Reinsurance Contract, Filing No. 93, on behalf of the reinsurer, Granite Re.

Filing No. 95, the Asset Purchase Agreement, identifies the "Purchaser" as AICI for itself and on behalf of AIC, AGIC and AMAG. It was signed by the president of AICI only. It refers, on page 4, to ancillary agreements that are part of the Asset Purchase Agreement. One ancillary agreement is the Granite Re reinsurance policy, referred to in the Asset Purchase Agreement as the "Granite Re Treaty." The Asset Purchase Agreement does not indicate which assets being purchased, if any, were being paid for by the individual entities and the Asset Purchase Agreement does not identify which assets were being transferred to each individual entity.

Filing No. 93, the MPCI Stop Loss Reinsurance Contract, referred to in the Asset Purchase Agreement as the Granite Re Treaty but hereafter referred to as the Contract, provides in its preamble the following:

**MPCI STOP LOSS REINSURANCE CONTRACT**

(hereinafter referred to as the "Contract")

In consideration of the mutual covenants hereinafter contained and subject to all the terms and conditions hereinafter set forth

GRANITE REINSURANCE COMPANY, LTD.

(hereinafter referred to as "Reinsurer")

> do hereby indemnify, as herein provided,
>
> ACCEPTANCE INSURANCE COMPANIES INC.
>
> (hereinafter referred to as the "Company")
>
> Wherever the word "Company" is used in this Contract, such term shall be held to include any and/or all of the subsidiary companies which are or may hereafter come under the management of the Company, provided that notice be given to the Reinsurer of any such subsidiary companies which may hereafter come under the management of the Company as soon as practicable, with full particulars as to how such acquisition is likely to affect this Contract.

Fil. #93 at 2.

The Contract was executed by John Martin, then the president of AICI, on behalf of the Company. Although signed in June of 2001, it became effective as of July 1, 2000, and, according to Article 1, was to "remain in full force and effect with respect to all Covered Business risks in force or attaching from that date through June 30, 2005." The reason it became effective as of July 1, 2000, is that the MPCI policy crop year begins on July 1, and covers losses for crops to be grown thereafter. Since the Asset Purchase Agreement included policies already written and effective from July 1, 2000, the reinsurance contract had to be consistent with the policy dates.

The premium for the reinsurance contract is defined in Article 11. It states:

> The Company will pay the Reinsurer a minimum and deposit premium of $6,000,000 at the signing of this treaty for the crop year 2001 and 2002 and shall pay a minimum deposit premium of $3,000,000 on January 1, 2003, a minimum deposit of $3,000,000 on January 1, 2004 and a minimum deposit of $3,000,000 on January 1, 2005.

Fil. #93 at 7.

In late 2001, AIC was put under supervision by the Nebraska Department of Insurance. It no longer sold insurance from that date forward. In 2002, AGIC was placed in receivership by the Department of Insurance. It could no longer sell crop insurance.

After the initial $6,000,000 premium was paid on execution of the Contract no premium payments were made in 2003, 2004, or 2005.

In 2005, AICI, the holding company, filed this Chapter 11 case in the District of Nebraska. Granite Re filed a claim in the Chapter 11 case for $9,000,000, representing the three years' premiums it claimed were due. In 2006, Granite Re sued AIC, one of the subsidiaries of AICI, in the United States District Court for the District of Nebraska. That case has been referred, by agreement of the parties, to the bankruptcy court as Adversary Proceeding A06-8015 and has been consolidated for discovery and trial with the claim issue mentioned above, and with an Adversary Proceeding A06-8115 filed in this bankruptcy court by AICI against Granite Re for unjust enrichment.

This case is about the interpretation of the Contract. Issues include which Acceptance

Companies were parties to the Contract; whether reinsurance coverage was actually provided by the Contract; for what years was coverage provided; and the amount of premium due for the coverage provided.

Contracting Parties

In response to the claim filed by Granite Re in the AICI bankruptcy case, AICI claims it is not liable for any additional premium because none of the Acceptance Companies sold or had in force any crop insurance in the crop years 2003, 2004, and 2005. With no risk to be reinsured, no reinsurance was needed and no premium was due. In addition, AICI claims that the Contract did not really provide any reinsurance coverage and therefore is void for lack of consideration.

In response to the Granite Re complaint against AIC, AICI and AIC claim that AIC is not a party to the Contract and it is not liable for the premiums. It is their position that AIC did not sign the Contract and the only Acceptance Companies entity that sold crop insurance and therefore needed reinsurance was AGIC. AICI, by its president, signed both the Asset Purchase Agreement and the Contract. According to the terms of both the Asset Purchase Agreement and the Contract, AICI signed on behalf of all of the Acceptance Companies. In the Asset Purchase Agreement each AICI subsidiary was specifically named. In the Contract however, as shown above, the definition of the "Company" that is a party to the Contract includes AICI, and "all of the subsidiary companies which are or may hereafter come under the management of the Company."

AICI and AIC do not explain why AGIC, which also did not sign the Contract, would be covered by it but AIC would not. AIC, although generally a property and casualty insurance company, sold multi-peril crop insurance, had significant revenue from such sales, and was the assignee from IGF of the Standard Reinsurance Agreement which was required by and approved by the managers of the Federal Crop Insurance Program. In addition, the indemnification provision bargained for in the Asset Purchase Agreement, which was executed on behalf of AICI and each of its subsidiaries, is included in Article 6 of the Contract. That indemnification is for the benefit of all of the purchasers listed in the Asset Purchase Agreement, which include both AICI and AIC. Finally, Filing No. 102, a resolution of the board of directors of AIC, authorizes AIC to be a party to the Asset Purchase Agreement and the ancillary agreements as defined in the Asset Purchase Agreement. I conclude that both companies are parties to the Contract.

Reinsurance Coverage

Mr. Martin, then-president of AICI and the other subsidiaries, and Mr. Symons, the representative of the sellers under the Asset Purchase Agreement and the representative of Granite Re at the time the Contract was executed, both testified that the intent of the Contract was to provide reinsurance at a level required by the Federal Crop Insurance Program for all of the multi-peril crop insurance policies which were purchased under the Asset Purchase Agreement and all future policies and renewals issued by the Company. In addition, the purpose of the Contract was to provide, as described in Part II of Article 6, the indemnification required by the Asset Purchase Agreement. (See endnote 1.) However, AICI and AIC assert that the language used in paragraph B of Article 9 (see endnote 2) of the Contract when defining "ultimate net loss" means that there never could have been an ultimate net loss at the layer at which reinsurance was required by the FCIC and purportedly provided by the Contract. Therefore, it is the position of AICI and AIC that no insurance was ever provided. As a result, AICI and AIC claim that not only was there no additional insurance premium owed for 2003, 2004 and 2005, but that Granite Re is liable for repayment of the $6,000,000 in premium that was paid upon execution of the Contract.

Both parties presented expert witness testimony on the issue of whether the Contract actually provides the required coverage. The expert for the Company is in the business of helping insurance companies obtain reinsurance. He has reviewed many reinsurance policies over his years of experience, but has never drafted such a policy and is not in the reinsurance business.

Article 9 and Article 6 are related and are written in reinsurance industry jargon. The expert witness for the Company asserts that the definition of "subject ultimate net loss" in paragraph B of Article 9 means that there could never be a "subject ultimate net loss" above 100% of net premium and, therefore, there will never be a "subject ultimate net loss" above 140% of the Company's subject net retained premium income for any crop year. Therefore, according to the expert, Granite Re did not provide the reinsurance required by the FCIC and intended to be purchased by the Company.

The expert for Granite Re, on the other hand, testified that the language in paragraphs A and B is standard reinsurance language. He testified that he could understand the argument made by the other expert, but in the context of the usage of trade in the business of reinsurance, the opinion of the Company expert really was twisting the words to obtain a meaning that is not the usual interpretation of such language in the reinsurance business. The expert for Granite Re has extensive experience in the reinsurance business, having been an owner and officer of reinsurance companies and having drafted numerous reinsurance contracts.

The Contract was entered into to meet a requirement of FCIC before it would allow the transfer of the book of business from IFG to the Acceptance Companies and was therefore crucial to consummation of the Asset Purchase Agreement. The Contract was reviewed by the Federal Crop Insurance Program officials, who did not criticize, comment upon, or reject the language of paragraph B of Article 9.

I accept the opinion of the expert witness for Granite Re based upon his experience in the industry, his understanding of the language used in reinsurance contracts, and the intent of the parties to the contract. I find that the language "subject ultimate net loss" means the ultimate net loss on business which is the subject of the contract, that is, MPCI, to distinguish it from an ultimate net loss on some other insurance business written by the Company. I therefore conclude that the Contract did provide the reinsurance coverage required by the FCIC and intended by the parties.

Premiums for Coverage

Granite Re claims that there was one contract covering five years with one premium, $15,000,000, payable in installments of $6,000,000 upon execution of the contract and $3,000,000 in the years 2003, 2004, and 2005. AICI and AIC claim that premiums were due only if MPCI policies were issued, renewed or in effect in 2003, 2004, and 2005. Since AGIC went into receivership in 2002 and was prohibited from selling such policies thereafter, there were no policies to be reinsured in those other years. In addition, since AIC went under supervision and did not sell any MPCI policies or other policies after 2001, it had no policies for which reinsurance was necessary. From the point of view of AICI and AIC, no future premiums were due because no policies were in effect which needed reinsurance coverage.

Article 1 of the Contract provides that it "shall remain in full force and effect with respect to all Covered Business risks in force or attaching" from July 1, 2000, through June 30, 2005. Article 3 provides that the business covered by the Contract is all the multi-peril crop insurance policies issued or renewed by the Company, IGF Insurance Company or Continental Casualty Company.

Article 11 requires premium payments for specific crop years with the initial payment of $6,000,000 covering the premiums for crop year 2001 and 2002. Granite Re did not charge a separate premium for the indemnification provisions required by the Asset Purchase Agreement. Premiums were due for providing reinsurance of MPCI risks for policies in effect in each particular crop year.

In order to obtain approval of the Indiana Department of Insurance, which regulated IGF, for the transfer of the multi-peril crop insurance policies to the Acceptance Companies pursuant to the Asset Purchase Agreement, Alan Symons, the president of Goran, on behalf of IGF, wrote a letter to the Department explaining the terms of the transaction. Fil. #153. Mr. Symons, the same person who negotiated the Contract on behalf of Granite Re, informed the Department that would be "$3,000,000 per year for the duration of the risk. [Five year maximum]"

Since the insurance risk being covered by the reinsurer is an annual risk limited to any particular crop year, neither the Acceptance Companies nor Granite Re would have any risk in those years in which crop insurance was not in force. Neither AGIC nor AIC sold or put in place any multi-peril crop insurance for the crop years 2003, 2004, and 2005. No premiums were due for those years because no risk of loss was reinsured for those years.

## Conclusion

The Contract is a policy of reinsurance which did provide coverage required by the FCIC for each crop year in which policies were in force. It also provided additional indemnification protection until June 30, 2005. Acceptance Company's claim for a reimbursement of the $6,000,000 initial premium paid is denied. Granite Re's claim for $9,000,000 of additional premium filed in the underlying bankruptcy case and contained in the adversary proceeding brought against AIC is denied. The adversary proceedings will be dismissed by separate order and the $9,000,000 claim filed in the underlying bankruptcy case will be denied by separate order.

DATED:   May 9, 2007

BY THE COURT:

/s/ Timothy J. Mahoney
Chief Judge

Notice given by the Court to:
  Robert F. Craig
  Jenna B. Taub
  Patrick Griffin
  John J. Jolley, Jr.
  United States Trustee

ENDNOTES

1. Article 6 of the Contract (Fil. #93) is as follows:

   REINSURING

   Part I:  The Reinsurer shall be liable for 100% of the subject ultimate net loss in excess of:
   1. 140%, but not greater than 150%, of the Company's subject net retained premium income for each crop year.
   2. The liability of the Reinsurer for the term of the treaty shall not exceed $40,000,000 in all without the payment of additional premium equal to a rate of 5% of subject net retained premium income for each year unearned.

   Part II:  In addition, the Reinsurer shall be jointly and severally liable to the Company, to the same extent and on the same terms and conditions that IGF Insurance Company and IGF Holdings, Inc. shall be liable to the Company, against all damages, losses, liabilities, costs and expenses of every kind whatsover [sic] incurred or suffered by the Company that result from, relate to or arise out of those matters specified by Article IX of the APA. Notwithstanding any other provision of this Contract, however, the Reinsurer shall not be liable to the Company under this Part II in excess of an aggregate of $9,000,000 and all provisions under the Contract which limit or exclude liability to the Company under this Part II shall not apply.

2. Article 9 of the Contract (Fil. #93) is as follows:

   DEFINITIONS

   A. The term "ultimate net loss" as used in this Contract shall mean the ratio of the net retained premium income into the net retained loss. An example of the calculation is as follows: net retained premium income equals $100 and the net retained loss equals $150 resulting in the calculation of $150 divided by $100 which equals 150%.

   B. The term "subject ultimate net loss" as used in this Contract shall mean the subject net retained premium on business the subject of this Contract, classified by the Company as MPCI.

   C. The term "net retained premium income" as used in this Contract shall mean gross premium income on Covered Business, less cessions to the FCIC's Assigned Risk, Developmental and Commercial Funds.

   D. The term "subject net retained premium income" as used in this Contract shall mean the net retained premium on Covered Business the subject of this Contract, classified by the Company as MPCI.

   E. The term "net retained loss" as used in this Contract shall mean the gross losses less all cessions to the FCIC's Assigned Risk and Developmental and Commercial Funds.